# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| RITA ESTELA AVILES, | ) ) | Case No. CV 09-2886-JEM |
| Plaintiff, | ) ) | |
| v. | ) ) ) | MEMORANDUM OPINION AND ORDER REVERSING DECISION OF COMMISSIONER AND REMANDING |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) ) | FOR FURTHER PROCEEDINGS |
| Defendant. | ) ) ) | |

## PROCEEDINGS

On April 24, 2009, Plaintiff Rita Estela Aviles ("Plaintiff") filed a Complaint seeking review of the decision by the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application under Title II of the Social Security Act for Social Security Disability Insurance benefits.  On July 6, 2009, the Commissioner filed an Answer to the Complaint.  On November 13, 2009, the parties filed a Joint Stipulation ("JS") setting forth their positions and the issues in dispute.

Pursuant to 28 U.S.C. § 636(c), both parties consented to proceed before the Magistrate Judge.  The matter is now ready for decision.  After reviewing the pleadings, transcripts, and administrative record ("AR"), the Court concludes that the Commissioner's decision should be reversed and remanded for further proceedings in accordance with law and with this Memorandum Opinion and Order.

**BACKGROUND**

Plaintiff was born on June 24, 1959.  (AR 40, 486).[1]  She was 45 years old on February 17, 2005, when she protectively filed an application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  (See AR 40, 112-14, 481, 484.)  Plaintiff had been working as a "wax molder" for several years, operating a machine used to make jewelry, when she allegedly developed limitations and pain in her upper extremities.  (AR 32.)  As a result, she has not worked since July 12, 2002, her claimed disability date.  (See id.)  Plaintiff is from El Salvador originally; she came to the United States and started working in approximately 1985.  (AR 486.)  As of June 2004, Plaintiff was 5'1" tall and weighed about 125 pounds.  (See AR 379, 392.)

Plaintiff's claim was denied at the initial level on June 10, 2005 (AR 46), and at the reconsideration level on September 9, 2005.  (AR 53.)  On February 3, 2006, Plaintiff filed a late request for a hearing, claiming her request was late because the reconsideration denial was mailed to an incorrect address.  (AR 58-66.)  In an Order dated February 24, 2006, Administrative Law Judge ("ALJ") Alexander Weir III denied Plaintiff's request for a hearing and dismissed her application.  (AR 42-45.)  On April 23, 2006, Plaintiff filed a request for review of the ALJ's order of dismissal.  (AR 67-69.)  On June 13, 2006, the Appeals Council vacated the ALJ's order of dismissal, finding that Plaintiff's had good reason for her late filing, based on the incorrect mailing address, and remanded the case to the ALJ for a hearing.  (AR 70-73.)

On January 23, 2007, the ALJ held an initial hearing; Plaintiff was 47 years old at that time.  (AR 479-526.)  At the hearing, the ALJ questioned the authenticity of the records from Plaintiff's primary treating physician, Dr. Howard Marans.  (See AR 509-12.)  The ALJ telephoned Dr. Marans' office from the hearing, and when the ALJ was informed that Dr.

---

[1] Plaintiff stated at her initial hearing that she was born on June 24, 1959.  Other documents in the record also reflect that birth date.  The Court notes, however, that a photocopy of a "Certificate of Naturalization" in the record states that Plaintiff was born on June 26, 1959.  (Cf., e.g., AR 117, 486.)

Marans was unavailable, the ALJ stated his intention to subpoena Dr. Marans' records and to have Dr. Marans testify at a supplemental hearing.  (See id.)

On June 12, 2007, the ALJ held a second, supplemental hearing, by which time the ALJ had verified the authenticity of Dr. Marans' records.  (See AR 527-80.)  Dr. Marans did not testify at the second hearing.[2]  (See AR 527, et seq.)

Vocational experts ("VEs") appeared and testified at both the initial and the supplemental hearing, and a Spanish language interpreter assisted Plaintiff at both hearings.  (AR 479, 527.)  A non-examining medical expert, Dr. William Clayton, reviewed Plaintiff's records and testified by telephone at the request of the ALJ at the supplemental hearing.  (AR 527.)

On July 18, 2007, the ALJ issued a decision denying Plaintiff's DIB application at step four of the five-step sequential evaluation.  (See AR 18-38.)  The ALJ found that Plaintiff had the severe impairments of medial epicondylitis and a history of carpal tunnel syndrome with bilateral surgical releases performed on both of Plaintiff's wrists.[3]  (AR 32-33.)

---

[2]  Plaintiff asserts that the ALJ did not subpoena Dr. Marans to testify at the supplemental hearing or make any other attempt to contact Dr. Marans for further clarification of his opinions.  (See JS at 14-15.)  This Court is uncertain from the record whether those assertions made by Plaintiff are true.

[3]  Medial epicondylitis has been defined as an overuse injury affecting the flexor-pronator muscle origin at the anterior medial epicondyle of the humerus, a bone of the upper arm or forelimb extending from the shoulder to the elbow.  See Emedicine website, from WebMD, at http://emedicine.medscape.com (as viewed in July 2010).  Carpal tunnel syndrome has been defined as a condition caused by compression of the median nerve in the carpal tunnel, the passage between the flexor retinaculum of the hand and the carpal bones that is sometimes a site of compression of the median nerve, and which may be characterized by weakness, pain, and disturbances of sensation in the hand and fingers.  See Merriam-Webster online Medical Dictionary at http://www2.merriam-webster.com (as viewed in July 2010).  A bilateral surgical release for carpal tunnel syndrome generally consists of an incision made in the palm and wrist to expose the carpal tunnel; then the transverse carpal ligament is incised; and finally the median nerve and flexor tendons are released from compression.  See Nucleus Medical Media website at http://catalog.nucleusinc.com (as viewed in July 2010).

1   Nevertheless, the ALJ found that Plaintiff had the Residual Functional Capacity ("RFC")[4] to

2   perform medium work with some limitations.  (AR 35.)  The ALJ noted that the VEs at both

3   the initial and the supplemental hearings testified that Plaintiff had the RFC to perform her

4   past relevant work ("PRW") as a "wax molder," a job which the Dictionary of Occupational

5   Titles ("DOT"), no. 549.685-038, describes as light, unskilled work, and which the VE at the

6   supplemental hearing testified is sometimes performed at a sedentary level.[5]  (AR 37, 515,

7   574.)  Based on these factors, the ALJ found that Plaintiff had the RFC to perform her past

8   relevant work as a wax molder, and was capable of performing the job both as she actually

9   performed it and as it is generally performed throughout the economy.  (AR 37-38.)

10          On August 15, 2007, Plaintiff filed a request for review of the ALJ's decision with the

11   Appeals Council.  (AR 15, 275-78.)  On March 13, 2009, the Appeals Council denied

12   Plaintiff's request for review and affirmed the ALJ's decision.  (AR 6-9.)  As noted, on

13   April 24, 2009, Plaintiff commenced the instant action.

14

15

16

_____

17          [4]  Residual functional capacity is what one "can still do despite [his or her] limitations"
     and represents an assessment "based on all the relevant evidence." 20 C.F.R. §§
18   404.1545(a)(1), 416.945(a)(1).  An RFC assessment identifies the individual's functional
     limitations or restrictions and assesses work-related abilities on a function-by-function
19   basis, and then assigns an RFC in terms of the exertional levels of work, that is, sedentary,
     light, medium, heavy, or very heavy.  See Social Security Ruling ("SSR") 96-8p.
20

21          [5]  The Dictionary of Occupational Titles ("DOT") is the Commissioner's primary source of
     reliable vocational information.  Johnson v. Shalala, 60 F.3d 1428, 1434 n.6 (9th Cir. 1995).
22   The SSRs and the DOT both use the same terms to define the exertional requirements of
     work in the national economy, that is, sedentary, light, medium, heavy, and very heavy, and
23   the terms have the same meanings in both.  See SSRs nos. 86-8, 00-4p. The DOT
     describes the job of "wax molder" as involving wax-molding machines that form products
24   such as jewelry through injection or centrifugal molding processes.  See DOT, 549.685-038
     Wax Molder (1991).  Plaintiff has stated that she performed this job at a jewelry shop called
25   "Baguette World" [sic], and that she "grabbed rubber molds, kept them closely [sic] tight with
     my hands and pushed them against the injector to fill up the molds, applied pressure all the
26   time []."  (See AR 124, 161.)  Plaintiff has also stated that she carried a rubber mold that
     weighed about 10 pounds a distance of 35 feet "from one room to another."  (AR 125.)  It is
27   uncertain from the record how many times Plaintiff repeated these steps in a workday.

28

**DISPUTED ISSUES**

As reflected in the Joint Stipulation, Plaintiff raises the following disputed issues as grounds for reversal or remand of the ALJ's decision:

1.      Whether the ALJ erred in rejecting the opinion of the medical expert Dr. Clayton, who testified at the supplemental hearing, and, in particular, erred in rejecting Dr. Clayton's opinion that Plaintiff's condition met the criteria for a listed impairment.

2.      Whether the ALJ erred in rejecting the opinions of Plaintiff's treating physicians and, in particular, the opinion of Dr. Marans.

3.      Whether the ALJ erred by presenting incomplete hypothetical questions to the VEs.

4.      Whether the ALJ erred by discounting the credibility of Plaintiff's subjective complaints.

**STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), this Court reviews the ALJ's decision to determine whether the ALJ's findings are supported by substantial evidence and whether the proper legal standards were applied.  DeLorme v. Sullivan, 924 F.2d 841, 846 (9th Cir. 1991).  Substantial evidence means "'more than a mere scintilla' but less than a preponderance."  Saelee v. Chater, 94 F.3d 520, 521-22 (9th Cir. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson, 402 U.S. at 401 (internal quotations and citations omitted).  This Court must review the record as a whole and consider adverse as well as supporting evidence.  Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006).  Where evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld.  Morgan v. Comm'r, 169 F.3d 595, 599 (9th Cir. 1999).  "However, a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'"  Robbins, 466 F.3d at 882 (quoting

Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989)); see also Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007).

## DISCUSSION

The Court concludes that the ALJ's determination that Plaintiff was able to perform her past relevant work is not supported by substantial evidence and that reversal and remand for further proceedings is warranted.

### A.    The Sequential Evaluation

The Social Security Act defines disability as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or . . . can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Commissioner has established a five-step sequential process to determine whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920.

The first step is to determine "whether the claimant is presently engaging in substantially gainful activity."  Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  If the claimant is engaging in substantially gainful activity, disability benefits will be denied.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987).  Second, the ALJ must determine whether the claimant has a severe impairment or combination of impairments.  Parra, 481 F.3d at 746.  An impairment is not severe if it does not significantly limit the claimant's ability to work.  Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996).  The ALJ, however, must consider the combined effect of all the claimant's impairments on his or her ability to function, regardless of whether each alone is sufficiently severe.  Id.  Also, the ALJ must consider the claimant's subjective symptoms in determining severity.  Id.

Third, the ALJ must determine whether the impairment is listed, or equivalent to an impairment listed, in Appendix I of the Social Security Regulations.  Parra, 481 F.3d at 746.  If the impediment meets or equals one of the listed impairments, the claimant is presumptively disabled.  Bowen, 482 U.S. at 141.

Fourth, the ALJ must determine whether the impairment prevents the claimant from doing past relevant work. Pinto v. Massanari, 249 F.3d 840, 844-45 (9th Cir. 2001). Before making the step four determination, the ALJ first must determine the claimant's RFC. 20 C.F.R. § 416.920(e). The RFC must consider all of the claimant's impairments, including those that are not severe. 20 C.F.R. §§ 416.920(e), 416.945; SSR 96-8p.

If the claimant cannot perform his or her past relevant work, the ALJ proceeds to the fifth step and must determine whether the impairment prevents the claimant from performing any other substantial gainful activity. Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000).

The claimant bears the burden of proving steps one through four, consistent with the general rule that, at all times, the burden is on the claimant to establish his or her entitlement to benefits. Parra, 481 F.3d at 746. Once this prima facie case is established by the claimant, the burden shifts to the Commissioner to show that the claimant may perform other gainful activity. Lounsburry v. Barnhart, 468 F.3d 1111, 1114 (9th Cir. 2006). If the Commissioner cannot meet this burden, then the claimant is disabled and entitled to benefits. Id.

In this case, the ALJ determined at step four of the sequential process that Plaintiff had an RFC for medium work with some limitations (AR 35) and could perform her past relevant work as actually and generally performed. (AR 37-38.) Those determinations are not supported by substantial evidence and are legally erroneous. Plaintiff cannot perform her past relevant work. The case will be reversed and remanded for further proceedings on the sole issue of whether Plaintiff can perform other jobs in the national economy under step five of the sequential process.

**B.    Summary of the Medical Evidence**

This Court has compiled the following summary of pertinent evidence regarding Plaintiff's medical history based on the ALJ's opinion and this Court's own review of the record:

In September 2002, Plaintiff saw Dr. Cathleen Godzik, an orthopedic surgeon, for a consultation in connection with Plaintiff's state workers' compensation claim.  (See AR 165-86.)  Plaintiff told Dr. Godzik that in July 2002, while working as a wax injector operator at a jewelry store called "Baguette World," she developed numbness and tingling in both hands and pain in both wrists, which radiated into her forearms and elbows.  (AR 172.)  Dr. Godzik noted an impression of the Plaintiff's condition as bilateral carpal tunnel syndrome, "de Quervain's tenosynovitis," and cubital tunnel syndrome of the right elbow.[6]  (AR 174.)  Dr. Godzik also prepared a report entitled "Hand and Upper Extremity Consultation," dated September 20, 2002.  In the report, she stated that "[t]he multiple nerve compressions and tendinitis in both upper extremities are the result of her job position of wax injector operator for Baguette World which requires her to perform extensive repetitive fine finger and wrist motions throughout her workday causing inflammation around the tendons and nerves in her hands, causing her complaints.  This is the result of exposure to cumulative trauma." (AR 175.)  On September 27, 2002, Dr. Godzik signed a form noting that Plaintiff had tried, unsuccessfully, to return to work on September 20, 2002.  (AR 171.)  Dr. Godzik noted that "[i]f light duty work not available then TTD [i.e., temporarily totally disabled] for 30 days." (AR 171.)  An electromyography, apparently performed at Dr. Godzik's direction in October 2002, found "mild carpal tunnel syndrome, bilaterally," and noted that "standard median conductions across both wrists were within normal limits."  (AR 179.)

On March 7, 2003, Dr. Howard Marans, who was Plaintiff's treating physician in connection with her workers' compensation claim, and who apparently treated Plaintiff from September 2002 through January 2006 (see AR 155), reported a diagnostic impression of bilateral carpal tunnel syndrome and bilateral elbow sprain/strain.  (AR 439.)  On May 8, 2003, Plaintiff underwent a left carpal tunnel release operation performed by Dr. Marans.

---

[6]  De Quervain syndrome, also known as "washerwoman's sprain," is an inflammation of the sheath or tunnel that surrounds the two tendons that control movement of the thumb. See Wikipedia website at http://en.wikipedia.org/wiki (as viewed in July 2010).

(AR 436.)  On August 21, 2003, Plaintiff underwent a right carpal tunnel release operation performed by Dr. Marans.  (AR 423.)

In or about April 2004, orthopedic surgeon Dr. Khiem Dao performed a consultative orthopedic exam, apparently at the request of Dr. Marans.  (AR 387-97.)  Upon examination of Plaintiff's elbows, Dr. Dao noted that Plaintiff complained of "tenderness over the bilateral medial epicondyles, right medial intermuscular septum, and left medial proximal forearm. There is also a painful palpable cord over the medial epicondyle, bilaterally."  (AR 392-93.) Upon examination of the wrists, Dr. Dao stated "Tinel's [sic] test was positive with radiation to the middle three fingers, bilaterally"; a nerve compression test and a "Phalen's" test were negative bilaterally.  (AR 393.)  Dr. Dao diagnosed "bilateral medial epicondylitis."  (AR 394.)

On April 8, 2004, Dr. Michael Pearl of Kaiser Permanente examined Plaintiff following x-rays of both of Plaintiff's elbows.  (AR 330-31.)  Dr. Pearl noted that the x-rays were negative, and diagnosed Plaintiff with medial epicondylitis in both shoulders.  (AR 330.)  Dr. Pearl related that Plaintiff stated that "[s]he does not have pain at rest but only when she is working with her hands."  (AR 330.)  Dr. Pearl's diagnosis stated "it is my opinion that surgery does not have much of a role for her condition.  In fact, I told her that if it were my elbows I would not have this operation.  She was somewhat tearful but got the information she was looking for."  (AR 330.)

In or about June 2004, Dr. Marans prepared a report following Plaintiff's carpal tunnel release procedures.  (AR 377-86.)  Dr. Marans noted that Plaintiff's subjective factors of disability included complaints of pain that ranged from slight to "rarely moderate" and "rarely more than moderate."  (AR 382.)  Dr. Marans found that Plaintiff suffered work restrictions of a 75% loss of capacity in her elbows to grip, grasp, push or pull, and a 25% loss of capacity in her hands and wrists to grip, grasp, push or pull.  (AR 383.)  Dr. Marans opined that Plaintiff did not have the capacity to perform her usual and customary duties and further opined that vocational rehabilitation was indicated.  (AR 384.)

On October 8, 2004, Dr. Marans prepared a "Supplemental Report," noting that a report from "Dr. Shirzad Abraham," dated August 24, 2004, had stated that Plaintiff "does not require significant work preclusions because of her elbows." (AR 406.)  In response, Dr. Marans said "I strongly disagree." (AR 406.)  Dr. Marans stated that "I have been seeing the patient for quite a long time and based on my persistent evaluation of her, she has significant symptomatology with inflammation about her elbows.  She has had effusion in her elbows with significant discomfort, and for him to state that she has very little findings, it is certainly incorrect based on my evaluation of her." (AR 406-07; see also Supplemental Report dated March 26, 2007 at AR 410-13.)  There is no direct evidence of Dr. Abraham's examination or treatment of Plaintiff in the record.

On May 4, 2005, Dr. Ursula Taylor performed an internal medicine evaluation of Plaintiff for the Department of Social Services.  Dr. Taylor opined, among other things, that "[I]t is suggested that repetitive elbow movement and bending is avoided to minimize future problems." (See AR 316-21.)  Dr. Taylor also noted that "[t]here is also a history of Carpal Tunnel Syndrome [], but Tinnel sign was negative and Phalen sign could not be performed due to complaint of pain of the elbows." (AR 320.)  Dr. Taylor opined that Plaintiff would be able to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8 hour workday; push and/or pull without limitations; and would be able to perform postural activities frequently. (See id.)  Dr. Taylor indicated no other limitations and, in particular, no limitations in lifting, carrying, walking, standing, or sitting. (See AR 320.)  Dr. Taylor stated "[t]here is no fine fingering manipulation impairment." (AR 321.)  However, Dr. Taylor stated that "[g]ross handling should be limited to [] occasionally to frequently, but not continuously.  Repetitive bending and use of the elbows is discouraged." (AR 321.)

On May 27, 2005, Dr. Elliott Gilper prepared a "Physical Residual Functional Capacity Assessment" form . (AR 342-49.)  The form stated, inter alia, that Plaintiff could lift 20 pounds occasionally and lift 10 pounds frequently, and noted that Plaintiff's ability to push and/or pull was unlimited. (AR 343.)  The form also stated that no manipulative

limitations, such as in handling or fingering, were established.  (AR 345.)  Dr. Gilper stated

that his conclusions contradicted the conclusions of Dr. Taylor, whose conclusions he said

were not supported by the evidence from the Internal Medicine CE and by his own

observations.  (AR 348.)  Dr. Gilper stated that Plaintiff did not return a pain questionnaire,

and Dr. Gilper did not consult a pain questionnaire before he assessed Plaintiff's RFC.  (AR

351.)

On January 13, 2006, Dr. Marans prepared a report of an orthopedic consultation.

(AR 399-405.)  Dr. Marans stated that Plaintiff suffered from "medial epicondylitis of both

her elbows, possible recurrent carpal syndrome, as well as possible bilateral ulnar

neuropathy."  (AR 405.)  Dr. Marans stated, inter alia, that Plaintiff was "very disabled" for

activities of daily living, unable to do most things around the house on a regular basis, and

precluded from any gainful employment utilizing the upper extremities.  (AR 405.)

On January 27, 2006, Dr. Marans prepared a form entitled "Physical Residual

Functional Capacity Questionnaire."  (AR 360-63.)  The form states, inter alia, that Plaintiff

has "throbbing bilateral elbow pain which is always present, [and] severe swelling and

weakness."  (AR 360.)  That questionnaire also stated that Plaintiff can frequently lift and/or

carry less than 10 pounds and sit for less than 6 hours in an 8-hour workday; Plaintiff has

limitations in pushing and/or pulling; and Plaintiff can never do manipulative fingering.  (AR

361-62.)

On May 18, 2006, an outpatient neurology consultation was performed by Dr. Craig

German of Kaiser.  (AR 369-70.)  Dr. German noted that Plaintiff "[w]orked in the jewelry

industry using some machine where she had to hold her elbows out and up, sort of in a

winged fashion, and then both her hands in front of her, moving her hands forward and

backward.  She performed this task for approximately 20 years [sic], 8 to 10 hours a per

day.  She states approximately 4 years ago, her elbows 'gave out,' and she then developed

the pain that she has now."  (AR 369.)  Dr. German's assessment noted Plaintiff's pain from

"repetitively holding her arms up and using her elbows," and stated that "a nonfocal

neurological exam, and a general exam show[ed] tenderness of the tendons in both her

1   arms at the elbows.  Patient's symptoms can be attributed to a tendinitis bilaterally at the

2   elbows." (AR 370.)

3        On March 7, 2007, Dr. Thomas Dorsey conducted an orthopedic consultation of

4   Plaintiff at the request of the Department of Social Services.  (AR 442-53.)  Dr. Dorsey

5   noted that "[t]here are voluminous records on this individual, however, only a few objective

6   findings." (AR 442.)  Dr. Dorsey noted that bilateral x-rays of Plaintiff's elbows were normal.

7   (AR 442.)  Dr. Dorsey noted that Plaintiff was taking Nabumetone 500 mg at that time.[7]

8   (AR 443.)  Plaintiff reported to Dr. Dorsey that, after she underwent the bilateral carpal

9   tunnel releases in 2003, she went to El Salvador and underwent muscle biopsies on both

10  upper extremities in November 2006.  (AR 159, 442.)  Dr. Dorsey noted that "[]the report of

11  the results of those muscle biopsies was (1) chronic inflammation, (2) Yalina deficiency [sic],

12  and (3) 'The fibers have lost their elasticity.'" (AR 442.)  Plaintiff stated that she had not

13  seen a doctor since she was in El Salvador; she was not undergoing treatment; and no

14  further surgery had been recommended.  (AR 442.)  Plaintiff complained of bilateral upper

15  extremity pain.  (AR 442.)  Dr. Dorsey's diagnosis stated "status post bilateral carpal tunnel

16  releases, 2003, with excellent clinical result," and "bilateral upper extremity pain, subjective

17  symptoms only." (AR 445.)  Dr. Dorsey also prepared a form entitled "Medical Source

18  Statement of Ability To Do Work-Related Activities (Physical)," and opined that, inter alia,

19  Plaintiff would be able to lift or carry up to 100 pounds occasionally and 50 pounds

20  frequently; and sit, stand, or walk for a total of 8 hours a day.  (AR 447-453.)

21       On April 6, 2007, Dr. Cleotilde Jose performed a comprehensive neurological

22  evaluation of Plaintiff at the request of the Department of Social Services.  (AR 454-61.)

23  Dr. Jose found no objective abnormalities on examination and no impairments indicated.

24  (AR 454-61.)  Upon motor examination, Dr. Jose noted that Plaintiff's "arms feels [sic] weak

25  as she was asked to raise them in front of her." (AR 455.)  Dr. Jose made a diagnosis of

26  _____

27       [7] Nabumetone is a medication typically used to relive pain, tenderness, swelling, and
    stiffness caused by oseoarthritis or rheumatoid arthritis.  See Pub Med Health website at
28  http://www.ncbi.nlm.nih.gove/ubmedhealth (as viewed in July 2010).

"persistent pain and weakness of the upper extremities of undetermined nature." (AR 456.)
Dr. Jose stated "I cannot explain the patient's persistent symptoms of pain and weakness.
There was no objective abnormality noted on the examination, EMG and Nerve Conduction
Velocity Studies." (AR 456.)  Dr. Jose stated that "[s]he could not do anything with her
upper extremities because of the persistent symptoms of pain and weakness." (AR 456.)

**C.    Analysis of Plaintiff's Ability To Do Past Relevant Work**

The ALJ denied Plaintiff's application at step four of the sequential evaluation, finding
that Plaintiff could perform her past relevant work as a wax molder, DOT no. 549.685-038,
both as she actually performed it and as it is performed in the general economy.  (AR 37-
38.)  The ALJ made this determination in spite of Plaintiff's combination of severe
impairments of medial epicondylitis and of carpal tunnel syndrome which necessitated
surgeries on both of Plaintiff's wrists.  In making this finding, the ALJ specifically discredited
or gave limited weight to the opinions of Dr. Marans, Plaintiff's treating workers'
compensation physician, and Dr. Clayton, the medical expert who testified at the
supplemental hearing.  (AR 35-38.)  The ALJ also found that Plaintiff was not fully credible.
(AR 36-37.)  These determinations are not supported by substantial evidence.

1.    Applicable Regulations Regarding Prior Relevant Work

Rulings of the Social Security Administration state that "[p]ast work experience must
be considered carefully to assure that the available facts support a conclusion regarding the
claimant's ability or inability to perform the functional activities required in this work."  SSR
82-62.[8]  "The claimant is the primary source for vocational documentation, and statements

---

[8] "[Social Security Rulings ("SSRs")], according to the governing regulations, are binding on all components of the Social Security Administration and represent precedent final opinions and orders and statements of policy and interpretations of the SSA." Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1224 (9th Cir. 2009) (internal quotations and citation omitted).  "SSRs reflect the official interpretation of the SSA and are entitled to 'some deference' as long as they are consistent with the Social Security Act and regulations." Id. (citation and internal quotation marks omitted).  SSRs do not carry the "force of law," but they are binding on ALJs nonetheless. Id. (citing Quang Van Han v. Bowen, 882 F.2d 1453, 1457 & n.6 (9th Cir. 1989)).

1   by the claimant regarding past work are generally sufficient for determining the skill level,

2   exertional demands, and nonexertional demands of such work."  SSR 82-62.

3   "Determination of the claimant's ability to do PRW [past relevant work] requires a careful

4   appraisal of (1) the individual's statements as to which past work requirements can no

5   longer be met and the reason(s) for his or her inability to meet those requirements; (2)

6   medical evidence establishing how the impairment limits ability to meet the physical and

7   mental requirements of the work; and (3) in some cases, supplementary or corroborative

8   information from other sources such as employers, the Dictionary of Occupational Titles,

9   etc., on the requirements of the work as generally performed in the economy."  SSR 82-62.

10  "The decision as to whether the claimant retains the functional capacity to perform

11  [PRW] . . . must be developed and explained fully in the disability decision . . . [and] every

12  effort must be made to secure evidence that resolves the issue as clearly and explicitly as

13  circumstances permit."  SSR 82-62.  The SSRs also state that "[s]ufficient documentation

14  will be obtained to support the decision."  SSR 82-62.  "Detailed information about strength,

15  endurance, manipulative ability, mental demands and other job requirements must be

16  obtained as appropriate."  SSR 82-62.

17          2.      The ALJ Improperly Rejected Plaintiff's Credibility

18          Central to the ALJ's RFC decision to deny Plaintiff benefits is his rejection of her

19  credibility.  The ALJ's credibility determination is unsupported by substantial evidence and is

20  legally erroneous.  Plaintiff's subjective pain testimony must be credited.  The ALJ's RFC

21  also was in error.

22          The test for deciding whether to accept a claimant's subjective symptom testimony

23  turns on whether the claimant produces medical evidence of an impairment that reasonably

24  could be expected to produce the pain or other symptoms alleged.  Bunnell v. Sullivan, 947

25  F.3d 341, 346 (9th Cir. 1991); Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998); Smolen

26  v. Chater, 80 F.3d at 1281-82 esp. n. 2; Cotton v. Bowen, 799 F.2d 1403, 1407 (9th Cir.

27  1986).  The Commissioner may not discredit a claimant's testimony on the severity of

28  symptoms merely because they are unsupported by objective medical evidence.  Reddick,

157 F.3d at 722; Bunnell, 947 F.2d at 343, 345.  If the ALJ finds the claimant's pain

testimony not credible, the ALJ "must specifically make findings which support this

conclusion."  Bunnell, 947 F.2d at 345.  The ALJ must set forth "findings sufficiently specific

to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."

Thomas v. Barnhart, 278 F.3d 949, 958 (9th Cir. 2002); Rollins v. Massanari, 261 F.3d 853,

856-57 (9th Cir. 2001); Bunnell, 947 F.2d at 345.  Unless there is evidence of malingering,

the ALJ can reject the claimant's testimony about the severity of a claimant's symptoms only

by offering "specific, clear and convincing reasons for doing so."  Reddick, 157 F.3d 722;

Smolen, 80 F.3d at 1283-84.  The ALJ must identify what testimony is not credible and what

evidence discredits the testimony.  Reddick, 157 F.3d at 722; Smolen, 80 F.3d at 1284.

Plaintiff's medically determinable severe impairments reasonably could be expected

to produce her alleged pain symptoms.  The record reflects Plaintiff's complaints that the

repetitive movements of her upper extremities as she actually performed her wax molder job

caused her pain.  There is no doubt that there is evidence in the record of underlying

impairments that could cause such pain.  The ALJ himself found that Plaintiff had medial

epicondylitis and carpal tunnel syndrome, both of which are severe impairments (AR 34)

that reasonably could give rise to pain in the upper extremities from repetitive movements.

Dr. Godzik, Dr. Marans, and Dr. Pearl all noted Plaintiff's complaints that repetitive finger

and wrist motions throughout the workday were causing pain.  (See AR 175, 330, 405.)

The ALJ, however, discounted the credibility of Plaintiff's complaints of pain from

these impairments, stating that "multiple medical sources have noted that the extent of her

allegations is not supported by objective evidence."  (AR 36.)  However, the regulations are

clear that "allegations concerning the intensity and persistence of pain or other symptoms

may not be disregarded solely because they are not substantiated by objective medical

evidence."  SSR 96-7p.  See also Bunnell, 947 F.2d at 345 ("once the claimant produces

objective evidence of an underlying impairment, and adjudicator may not reject a claimant's

subjective complaints based solely on a lack of objective medical evidence; Rollins, 261

1  F.3d at 857 (subjective testimony cannot be rejected on "sole" ground that objective medical

2  evidence is lacking).

3       Important information about symptoms recorded by medical sources and reported in

4  the medical evidence may include descriptions about the onset of disability and factors that

5  precipitate and aggravate symptoms.  SSR 96-7p.  Here, the record reflects Plaintiff's

6  claims that her upper extremities just "gave out" one day in July 2002 after she had

7  performed her job as a wax molder for several years, and an attempt to return to work after

8  her initial injury again resulted in disabling upper extremity pain.  (See AR 501-02.)  Medical

9  sources have described these factors as "cumulative trauma" and "repetitive movement"

10 injury.  (See AR 175, 316-21.)  Dr. Clayton termed this "overuse syndrome."  The ALJ

11 criticizes that diagnosis as not medically accepted but the record supports a finding that

12 overuse is a factor that precipitates or aggravates Plaintiff's subjective pain complaints.

13      Plaintiff's medically determinable severe impairments reasonably could produce her

14 subjective pain symptoms.  There is no evidence of malingering.  Thus, the ALJ can reject

15 Claimant's testimony on the severity of her pain only with "specific, clear and convincing

16 reasons."  Reddick, 157 F.3d at 722; Smolen, 80 F.3d at 1283-84.

17      The ALJ primarily discounts Plaintiff's credibility for three reasons: (1) Plaintiff's

18 claimed difficulties with English; (2)  Plaintiff's failure to pursue vocational rehabilitation; and

19 (3) Plaintiff's appearance and demeanor at the two hearings before the ALJ.  (See AR 36-

20 37.)  However, this Court does not find these reasons for discounting Plaintiff's credibility

21 convincing.  First, the Court is not aware of any authority that states that Plaintiff does not

22 have the right to have an interpreter assist her at a hearing before an ALJ.  Cf. Social

23 Security Program Operations Manual ("POMS") GN 00203.001 (claimant may provide

24 qualified interpreter, or SSA will provide interpreter).  See also Richard C. Ruskell, Social

25 Security Disability Claims Handbook, § 3.15 Interpreters (May 2010) (same).  The record

26 also reflects that some of Plaintiff's medical records are apparently in Spanish – particularly

27 records from El Salvador, records for which the ALJ declined to hold the record open to

28 allow those records to be translated into English.  (See AR 579.)  Plaintiff claimed at the

1   hearing that to read and write in English is different for her than to talk.  (AR 495.)  Plaintiff

2   testified that she used an interpreter at all of her workers' compensation appointments.  (AR

3   506.)  Plaintiff also testified that she cannot hear very well and wanted an interpreter for that

4   reason also.  (AR 487.)  Based on the foregoing, this Court does not find convincing the

5   ALJ's assertion that, because Plaintiff apparently took a driver's test and a citizenship test in

6   English, Plaintiff's request to have a Spanish interpreter at her hearing impugns her

7   credibility.

8          Second, the ALJ's finding that Plaintiff's lack of participation in vocational

9   rehabilitation impugns her credibility is also less than convincing, particularly to the extent

10  that the ALJ relies on that determination to deny Plaintiff's application at step four.  The ALJ

11  does not discuss or dispute the evidence in the record that shows that, after Dr. Marans

12  found that Plaintiff could not perform her PRW and recommended vocational rehabilitation,

13  Plaintiff tried unsuccessfully to return to her PRW.  (See AR 171.)  The record also reflects

14  that Plaintiff reported for an interview to start vocational rehabilitation, but became

15  discouraged when she was told that she could not be retrained due to her medical condition.

16  (See AR 402.)  The record reflects Plaintiff's statement that she was offered vocational

17  rehabilitation but she had to decline "because none of the training offered could

18  accommodate the limitation imposed by my injuries"; and Plaintiff asked "[i]s there a job

19  where one doesn't have to use the arms?"  (AR 150.)  In particular, the record does not

20  reflect that vocational rehabilitation would restore or accommodate the limitations in

21  Plaintiff's upper extremities or allow Plaintiff to perform her PRW.  The Court does not find

22  that the record shows affirmative evidence that Plaintiff has been malingering, and therefore

23  the ALJ must provide clear and convincing reasons to reject Plaintiff's testimony.  In

24  particular, the ALJ's opinion that Plaintiff's failure to pursue vocational rehabilitation justifies

25  a denial at step four is unconvincing, because there is no evidence that vocational

26  rehabilitation would have had any effect on Plaintiff's ability to perform her PRW.

27          Likewise, the ALJ's assertion that Plaintiff's demeanor at the two hearings

28  undermined her credibility is conclusory and unconvincing.  An ALJ may not properly base

17

his opinion on so-called "sit and squirm" jurisprudence, based on a claimant's apparent lack of symptoms at the hearing, particularly where the claimant's subjective complaints are supported by evidence in the record.  See Perminter v. Heckler, 765 F.2d 870, 872 (9th Cir. 1985).

On the other hand, the ALJ offers no discussion, and did not discredit, Plaintiff's complaints of pain and disabling limitations in her daily activities.  The ALJ does not address the longitudinal record of medications (see, e.g., AR 499-500, 506), physical therapy, and home self-treatments, including application of ice packs three times a day (AR 491) that Plaintiff has undergone to manage her pain and alleviate symptoms. This evidence further renders the ALJ's analysis of Plaintiff's credibility unconvincing.

The ALJ's reasons for rejecting Plaintiff's credibility do not meet the clear and convincing test.  Plaintiff's subjective pain symptoms must be credited.  She cannot perform her PRW.  The ALJ's RFC assessment also was in error.

3.  The ALJ Improperly Rejected Physician Testimony

The ALJ did not provide legitimate reasons supported by substantial evidence for discounting the opinions of Dr. Marans and Dr. Clayton.

In evaluating medical opinions, the case law and regulations distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining, or consulting, physicians).  See 20 C.F.R. §§ 404.1502, 416.927; see also Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).  In general, an ALJ must accord special weight to a treating physician's opinion because a treating physician "is employed to cure and has a greater opportunity to know and observe the patient as an individual."  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted).  If a treating physician's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons.  Lester, 81 F.3d at 830. However, if the treating physician's opinion is contradicted by another doctor, such as an examining physician, the ALJ may reject the treating physician's opinion by providing

1    specific, legitimate reasons, supported by substantial evidence in the record.  Lester, 81

2    F.3d at 830-31; see also Orn, 495 F.3d at 632; Thomas v. Barnhart, 278 F.3d 947, 957 (9th

3    Cir. 2002).  Where a treating physician's opinion is contradicted by an examining

4    professional's opinion, the Commissioner may resolve the conflict by relying on the

5    examining physician's opinion if the examining physician's opinion is supported by different,

6    independent clinical findings.  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995);

7    Orn, 495 F.3d at 632 (ALJ may reject opinion of treating physician in favor of examining

8    physician whose opinion rests on independent clinical findings).  Lastly, "[t]he opinion of a

9    non-examining physician cannot by itself constitute substantial evidence that justifies the

10   rejection of the opinion of either an examining physician or a treating physician"; but such an

11   opinion may serve as substantial evidence when it is consistent with and supported by other

12   independent evidence in the record.  Lester, 81 F.3d at 830-31; Morgan, 169 F.3d at

13   600.

14       The ALJ offers several reasons for crediting the opinions of the examining doctors,

15   Drs. Taylor, Dorsey, and Jose, over the opinions of Plaintiff's treating physician Dr. Marans

16   and the testifying medical expert Dr. Clayton.  Not all of the ALJ's reasons, however, appear

17   legitimate and supported by substantial evidence in the record.  The ALJ's assessment that

18   Plaintiff – a 5'1" tall woman who weighs 125 pounds – is capable of medium work that

19   requires occasional lifting of 50 pounds and frequent lifting of up to 25 pounds (see 20

20   C.F.R. § 404.1567(c)) must be based on Dr. Dorsey's assessment, because Dr. Dorsey is

21   the only physician who found that Plaintiff has anything more than the RFC for light work.

22   Dr. Dorsey in fact found that Plaintiff would be capable of heavy work, and able to lift or

23   carry up to 100 pounds occasionally and 50 pounds frequently.  (See AR 447-453.)  In light

24   of Plaintiff's short height and modest weight, Dr. Dorsey's assessment strains credulity,

25   does not appear legitimate, and is well outside of any other physician's assessment of

26   Plaintiff's physical exertional capabilities.

27       Furthermore, the ALJ criticism that Dr. Clayton's testimony is based on subjective

28   complaints is unsupported by substantial evidence.  Dr. Clayton testified that the record

shows that on an "objective" basis, Plaintiff is limited to "10 pounds of force, lifting, carrying"

and "pushing and pulling," and is "not able to do repetitive use of the upper extremities,"

quantifying that "she can use her hands more than 10 minutes repetitively at a time, and two

hours total in an eight-hour day," and "can't use more than 10 pounds of force more than

two hours total."  (AR 567.)  Although Dr. Clayton's testimony may not be substantial

evidence, the ALJ does not explain explicitly how any contrary objective findings cast doubt

on Dr. Clayton's RFC assessment.[9]

4.   The ALJ's Decision That Plaintiff Can Perform Her

Past Relevant Work Is Unsupported By Substantial Evidence

The ALJ improperly discounted Plaintiff's subjective pain evidence.  The ALJ also

improperly discounted the testimony of Dr. Clayton.  As a result, substantial evidence does

not support the ALJ's opinion that Plaintiff can perform her PRW as she actually performed

it at the jewelry shop due to her pain and limitations in raising her arms and performing

repetitive movements.  Additionally, the VE at the first hearing testified that, if Plaintiff had to

have her arms in a bent position for more than 5 minutes at a time, or for more than about

---

[9] The ALJ devotes significant discussion to discrediting Dr. Clayton's finding that Plaintiff suffers from a "subjective" condition that Dr. Clayton terms "overuse syndrome"; and the ALJ rejected that opinion because the ALJ says it was "not a recognized medical diagnosis," and because the diagnosis of "overuse syndrome is based solely on [Plaintiff's] subjective complaints.  There is no objective medical evidence."  (See AR 31-34.)  The ALJ asserts that "overuse syndrome" is not listed in several medical sources, although the ALJ does note that the Encyclopedia of Medicine describes an "overuse injury."  (See AR 34-35.)  This Court notes that "overuse syndrome," also sometimes called cumulative trauma disorder (CTD) or repetitive strain injury (RSE), is a condition characterized by chronic irritation to a body part.  See website About.com: Orthopedics at http://orthopedics. about.com/cs/ sportsmedicine/a/overuse.htm (as viewed in July 2010).  That website states that many conditions can fall under the category of overuse syndromes, including carpal tunnel syndrome and wrist tendonitis.  See id.  In any event, it is not necessary to decide the issue of whether "overuse syndrome" is a recognized, separate medical diagnosis because Plaintiff's subjective complaints reasonably could be caused by the severe underlying impairments of medical epicondylitis or carpal tunnel syndrome that were identified by the ALJ.

1   10 minutes in an hour (which the record suggests was necessary at Plaintiff's PRW), she

2   could not perform such a job.  (AR 524-25.)

3       Furthermore, the ALJ's opinion that Plaintiff could perform her PRW as it is generally

4   performed in the national economy does not appear to be supported by substantial

5   evidence.  The VE at the first hearing testified that a hypothetical claimant who is precluded

6   from constant or repetitive grasping, with a limitation on forceful gripping or grasping, could

7   not perform Plaintiff's PRW.  (See AR 515-17.)  The VE testified that Plaintiff possibly could

8   do other work in the economy, but could not do jobs that would require constant gripping

9   and grasping.  (AR 516.)  The VE testified that most other unskilled work in the national

10  economy requires frequent handling and fingering; but with a limit only on gripping and

11  grasping, but no limit on handling and fingering, the Plaintiff could do other work.  (AR 517-

12  18.)  The VE testified that an English language limitation would further limit the availability of

13  other work that Plaintiff could do.  (AR 521-22.)

14      The VE at the second hearing contradicted the DOT and testified that Plaintiff could

15  perform her PRW as a wax molder because that job, contrary to the DOT's classification,

16  was usually performed at the sedentary level.  (AR 574.)  However, that VE's opinion was

17  based on the supposition that the job of wax molder could be performed sitting for 8 hours a

18  day.  (AR 574.)  The DOT classification of the job itself states that the "[p]hysical demand

19  requirements are in excess of those for Sedentary Work," and states that "a job should be

20  rated Light Work . . . (2) when it requires sitting most of the time but entails pushing and/or

21  pulling of arm or leg controls . . . ."  DOT 549.685-038.  The rulings state that when there is

22  an apparent unresolved conflict between the VE's testimony and the DOT, the ALJ must

23  fully develop the record and elicit a reasonable explanation for the conflict before the ALJ

24  can rely on the VE's testimony.  See SSR 00-4p.  "Neither the DOT nor the VE [] evidence

25  automatically 'trumps' when there is a conflict.  The adjudicator must resolve the conflict by

26  determining if the explanation given by the VE [] is reasonable . . . ."  SSR 00-4p. Here, the

27  second VE testified that sitting for 8 hours would classify Plaintiff's PRW as sedentary work

28  but did not discuss the pushing and/or pulling requirements of the job.

1    Furthermore, the second VE testified that, if Plaintiff could perform forceful gripping

2    or grasping at the sedentary level, she could do her PRW.  The VE, however, testified that,

3    if Plaintiff could not lift more than 10 pounds, and could only do so for 2 hours in an 8-hour

4    day, she could not do her PRW.  (AR 574-77.)   The VE also testified that, if Plaintiff was

5    absent from work 3 times a month due to her medical impairments, she could not do her

6    PRW or any other work.  (AR 576-77.)

7    The Court finds that the ALJ's determination at step four that Plaintiff has the RFC to

8    perform her PRW, both as she actually performed it and as it is generally performed in the

9    economy, is not supported by substantial evidence.  Crediting Plaintiff's subjective pain

10    evidence, she cannot perform her PRW.

11    **D.    Reversal, Remand, or Award of Benefits**

12    When the Commissioner's decision is not supported by substantial evidence, the

13    Court has authority to affirm, modify, or reverse the decision "with or without remanding the

14    cause for rehearing."  42 U.S.C. § 405(g); McCartey v. Massanari, 298 F.3d 1072, 1076 (9th

15    Cir. 2002).  "Remand for further administrative proceedings is appropriate if enhancement of

16    the record would be useful."  Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004); see

17    also Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir. 2000).

18    Here, the Court has determined that the ALJ's determination that Plaintiff can

19    perform her PRW was in error.  Because Plaintiff's subjective pain evidence must be

20    credited, the Court also has determined that Plaintiff cannot perform her PRW.  The ALJ,

21    however, did not reach step five of the sequential evaluation process or make any rulings on

22    whether other jobs exist in the national economy that Plaintiff could perform.  There was

23    some VE testimony on other jobs, but the testimony of the two VEs was conflicting.  Also,

24    the first VE did not have the benefit of the additional exhibits and medical records that were

25    before the second VE.  Thus, remand is appropriate for the ALJ to address step five of the

26    sequential evaluation,  crediting Plaintiff's subjective pain testimony.  The ALJ also should

27    admit as an exhibit Plaintiff's medical records from El Salvador, which may require

28    translation from Spanish.  Further VE testimony would appear to be necessary.

**ORDER**

IT IS HEREBY ORDERED that Judgment be entered reversing the decision of the Commissioner of the Social Security Administration and remanding for further proceedings in accordance with law and with this Memorandum Opinion and Order.

LET JUDGMENT BE ENTERED ACCORDINGLY.


DATED: <u>August 6, 2010</u>                    <u>          /s/ John E. McDermott          </u>
                                                    JOHN E. MCDERMOTT
                                        UNITED STATES MAGISTRATE JUDGE